UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DENES Q. & ANN MARIE C., individually
and on behalf of their infant daughter, Y.Q.,

Plaintiffs,

-against-

JANET CAESAR et al.,

Defendants.
-----------------------------------------------------------------x

SEP 2 2 2011

BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
07-CV-1281 (CBA) (JO)

AMON, Chief United States District Judge:

Denes Q. and Ann Marie C. have filed a lawsuit, individually and on behalf of their

infant daughter Y.Q., against two private hospitals and a private physician (the medical

defendants), as well as the City of New York and several of its employees responsible for

detecting and preventing child abuse (the City defendants).

Relevant to this decision, the plaintiffs allege that the medical defendants illegally

detained and examined Y.Q. after her parents brought her to a private hospital in January 2006

with a burn that no one could explain, which led the medical defendants, and later the City

defendants, to suspect child abuse. They also allege that the medical defendants denied Y.Q. her

constitutional right to adequate medical care and illegally participated in the prosecution of

Denes and Ann Marie for child abuse. That prosecution lasted from January to March 2006.

The City defendants have settled. The medical defendants have moved for summary

judgment on the plaintiffs' federal constitutional and state law claims. For the reasons that

follow, the motion is granted with respect to the federal claims. The Court declines to exercise

jurisdiction of the state law claims.

1

## BACKGROUND

### I. Pre Hospital

On January 4, 2006, Denes and Ann Marie went to work and left their twenty-two month old daughter Y.Q. with her regular babysitter. (Pl. R. 56.1 ¶ 6.) Later that day, Denes's mother retrieved Y.Q. from the babysitter and took her to the grandmother's house, which was across the street from Denes and Ann Marie's house. (Id. ¶ 7.) Sometime after 7:30 p.m. that night, Denes left work and traveled to his mother's house to retrieve his daughter. (Id. ¶ 8.)

When he arrived at his mother's house, Denes noticed that Y.Q. "was crying and being very fidgety." (Denes Dep. 37.) Denes asked his mother what was wrong with his daughter, and his mother said that she did not know and that Y.Q. was "just very cranky." (Id.) When Denes lifted his daughter to leave, he noticed that her clothing smelled "like a degreaser." (Id. at 39.)

Soon after he arrived home, Denes went upstairs to change Y.Q.'s diaper. While changing the diaper, Denes did not notice any marks on Y.Q., although he did notice that Y.Q. "was very fidgety and unusually cranky." (Id. at 40.) While changing Y.Q.'s diaper, Denes continued to smell what he identified as a degreaser. (Id.)

Denes then took his daughter downstairs, where she calmed a little but was still more "fidgety" than normal. (Id. at 41.) Denes decided to take Y.Q. to her crib to make her more comfortable. When he arrived at the crib he noticed for the first time that Y.Q. was wearing two "onesies," which was unusual because he and Ann Marie never dressed Y.Q. in that way. (Id. at 42.) When he began to remove the outer onesie, Denes noticed a wet spot on both the inner and outer onesie. (Id.) Denes smelled the wet spot and noticed that it smelled like degreaser.

Denes continued to remove the onesies, and it was then that he noticed for the first time a mark on Y.Q.'s left chest. (Id. at 43.) The mark was about "two and a half, three inches" in size

2

and "shaped like a tooth," meaning that it "had two roots and a circular portion on top." (Id.) Denes described the mark as "red, yellow, brown, [and] green." (Id.) Upon discovering the mark, Denes "just freaked and panicked and decided [that he] had to get to the emergency room with [his] daughter" because "something was wrong with her." (Id.)

## II. Hospital

Soon after Denes discovered the burn (which was at about 8:00 p.m.), Ann Marie returned home and she, Denes, and Denes's mother all took Y.Q. to the emergency room. (Id. at 44.) They went first to Forest Hills Hospital, a defendant in this action, which is a private hospital that is owned by Long Island Jewish Medical Center, also a defendant in this action. (Pl. R. 56.1 ¶¶ 3, 5.)

Doctors at Forest Hills examined Y.Q., determined that she had been burned, and diagnosed her burn as a chemical burn, not a thermal burn. (Id. ¶¶ 10, 96.) Relevant to this litigation, chemical burns are less likely than thermal burns to be the result of child abuse. (Id. ¶¶ 122, 124.)

When asked at Forest Hills to explain their daughter's injuries, neither Denes nor Ann Marie was able to explain the burn, although they did explain their belief that Y.Q. had been injured while in the care of her babysitter or grandmother. (Id. ¶ 11.) The babysitter (who was contacted by telephone) could not explain the injury, and neither could the grandmother. (Denes Dep. 59–61, 84–85.)

Later on the evening of January 4, 2006, Forest Hills staff, consistent with New York law, which identifies them as mandated reporters, contacted the New York State Central Register and reported that, because Y.Q. had a burn that none of her caregivers was able to explain, they suspected that she was the victim of child abuse. (Pl. R. 56.1 ¶ 13.) The Central Register

3

forwarded the report to the New York Administration for Children's Services (ACS) for investigation. (Id. ¶ 20.)

Later that night, or early on the morning of January 5, 2006, Forest Hills transferred Y.Q. to Schneider Children's Hospital, which is also a private hospital owned and operated by Long Island Jewish Medical Center and a defendant in this action. (Id. ¶ 21.)

One of the first doctors to examine Y.Q. on January 5, 2006 indicated that she had an "unexplained injury" and that Debra Esernio-Jenssen, M.D., a child abuse specialist and member of Schneider's Child Protection Team, should be contacted. (Ex. F 100092.) Dr. Jenssen subsequently examined Y.Q. Her notes indicate that Y.Q.'s clothes had no smell (it is not clear whether Y.Q. was still wearing the same onesies that she was wearing earlier) and that there were no "splash marks" on Y.Q.'s chest. (Ex. F 100094.)

Dr. Jenssen also interviewed Denes and Ann Marie, as well as Denes's mother and the babysitter who had cared for Y.Q. the previous day. (Pl. R. 56.1 ¶¶ 146–48.) Dr. Jenssen testified that she conducted those interviews to determine the time at which the injury to Y.Q. occurred. (Jenssen Dep. 54.) There is evidence that during some or all of these interviews, Dr. Jenssen did not clearly identify herself as associated with Schneider's Child Protection Team. (Pl. R. 56.1 ¶¶ 146–48.)

After her examination and interviews, Dr. Jenssen concluded that Y.Q.'s burn was the result of contact with a hot liquid (i.e. it was a thermal burn), not contact with a chemical. (Id. ¶ 150.) Dr. Jenssen's interview report (dated January 6, 2006) shows that she further determined that the burn "could certainly have resulted from an accidental spill" of hot liquid, as Y.Q.'s grandmother had said that she had been making soup while in the kitchen with her granddaughter, although the grandmother "denied [Y.Q.] having contact with soup or hot water."

4

(Ex. F 100125.) Dr. Jenssen further indicated that "[b]oth parents and the sitter seemed to be genuinely concerned and credible." (Ex. F at 100125–26.)

ACS notes indicate that on the evening of January 5, 2006, Dr. Jenssen spoke with ACS and informed the agency that "she didn't feel that it was an abusive injury, and that [she and a Dr. Crystal] still didn't know what it was, and that she will interview the babysitter. Dr. Jenssen stated that they still could not figure it out." (Ex. L 193.)

After her examination and interviews, Dr. Jenssen ordered that a retinal exam and skeletal survey be performed on Y.Q. (Ex. F 100094.) Another physician who examined Y.Q. upon arrival at Schneider had a similar recommendation, although the medical records, which contain some illegible handwriting, do not clearly reveal the identity of the physician. (Pl. R. 56.1 ¶ 32.)

Dr. Jenssen secured the consent of Y.Q.'s parents to perform these exams. (Ex. F 100094.) With respect to the skeletal survey, Denes testified that Dr. Jenssen explained to him that she wanted to know the extent of Y.Q.'s injuries and that a "skeletal survey would be something to help us understand how severe her injuries are or if she's hurt in any other way, shape, or form." (Denes Dep. 58.)

Dr. Jenssen also explained to Denes and Ann Marie that, if the survey ruled out child abuse (by, for example, failing to reveal evidence of suspicious healed breaks), ACS would end its investigation. (Pl. R. 56.1 ¶ 159.) Dr. Jenssen also suggested to Y.Q.'s parents that the more they cooperated with ACS's efforts to determine whether Y.Q. had been abused, the sooner they would be able to go home with their daughter. (Id. ¶ 160.)

With respect to the retinal exam, Dr. Jenssen told Denes that Y.Q.'s burn could have been caused by contact with a chemical and that it was possible that some of the offending chemical

had entered Y.Q.'s eyes. (Id.) She explained to Denes that the eye exam could detect any chemicals in his baby's eyes. (Id.)

Notwithstanding Dr. Jenssen's representations to Denes, the form requesting an ophthalmology consultation states that the reason for the consult was to rule out shaken baby syndrome; a shaken baby will have retinal hemorrhages that can be detected by the exam. (Pl. R. 56.1 ¶ 158.) Dr. Jenssen did not tell Denes about the fact that a retinal exam is a tool used to diagnose child abuse.

Both the skeletal survey and ophthalmology exams eventually came back negative. That is, neither revealed any signs of abuse. (Ex. F 100101.)

Dr. Jenssen was not the only Schneider physician examining Y.Q. On January 6, 2006, Burt Greenberg, M.D., a plastic surgeon, consulted on Y.Q. and recommended a course of treatment, including a possible surgical debridement. (Pl. R. 56.1 ¶¶ 30, 162.) Also on January 6, 2006, both a pediatric dermatologist and an ophthalmologist examined Y.Q. (Id. ¶ 36.) The dermatologist's report identifies Y.Q. as an inpatient with a "presumed chemical burn." (Ex. F 100128.) The ophthalmologist's report lists her as having a "chemical burn left chest." (Ex. F 100130.)

ACS notes from January 6, 2006, indicate that Dr. Jenssen communicated with ACS and "stated that [Y.Q.'s] burn is a 3rd degree thermal (liquid) burn. Dr. Jenssen stated that it appeared to be boiling water, clear liquid. . . . Dr. Jenssen stated that there was a mention of soup cooking, maybe that had something to do with it." (Ex. L 196.)

On January 7 and 8, 2006, multiple physicians evaluated Y.Q., and they recommended that she continue on the treatment course already established. (Pl. R. 56.1 ¶ 37.) Medical

6

records indicate that Y.Q. was to be evaluated again on January 9, 2006 by a plastic surgeon to determine whether her burn needed debridement. (Id. ¶ 38.)

ACS progress notes from January 9, 2006 indicate that Y.Q.'s case was "conferenced" and that "[i]t was advised that since family had no explanation for injury and doctor's [sic] are not conclusive, case must be referred to our legal division." (Ex. L 197.)

Later on January 9, 2006, at about 2:00 p.m, a "Nurse Patty," from Schneider called ACS about Y.Q. (Pl. R. 56.1 ¶ 40.) According to ACS notes of the call, the nurse told ACS that Y.Q. was "ready for discharge." (Ex. L 197.) ACS informed the nurse that Y.Q. was not to be discharged and that the nurse should speak with a "social worker." (Id.) ACS further told the nurse that it would "inform her of any new details." (Id.)

At about 6:45 p.m. on January 9, 2006, ACS asked Schneider to place a "social hold" on Y.Q. (Pl. R. 56.1 ¶ 42; Ex. F 100105.) Although the plaintiffs dispute the propriety of the social hold, there does not appear to be any dispute about the fact that a social hold generally bars a hospital from discharging a child like Y.Q. until ACS can arrange for her safe discharge. (Pl. R. 56.1 ¶ 43.)

According to ACS progress notes, at some point after it was clear that ACS planned to seek removal, an ACS employee informed Denes that "the case was going to court." (Ex. L 199.) Denes asked why, and he was told that "the baby had a serious injury, and nobody could account for it. [The ACS employee] explained that it was difficult to send a child home not knowing who did what to the child. [The ACS employee] explained that the child could be at risk for further harm, because ACS did not know who did anything to the child." (Id.)

On January 10, 2006, although it is not clear precisely when, ACS formally decided to pursue child abuse charges against Denes, Ann Marie, and Y.Q.'s grandmother. (Pl. R. 56.1

7

¶ 57.) That afternoon, ACS filed a petition in family court and asked that the court order Y.Q. removed from her parents' custody. (Ex. G.) The petition identified as the persons "who are responsible for the abuse and neglect" of Y.Q. as Denes, Ann Marie, Denes's mother, and the babysitter. (Id.)

Also on January 10, 2006, Y.Q. was again evaluated by physicians, including Dr. Greenberg, the plastic surgeon. (Ex. F 100105–06.) Dr. Greenberg determined that Y.Q.'s burn required debridement and he also determined that Y.Q. would likely need a skin graft. (Ex. F 100106.)

Later on January 10, 2006, the family court ordered that Y.Q. be removed. (Ex. K.) That removal order states that removal was necessary because Y.Q. "suffered third degree burns with no plausible explanation by respondents as to how she sustained such burns." (Id.) Denes and Ann Marie appeared in family court on January 11, 2006 to contest the removal order. (Pl. R. 56.1 ¶¶ 78–79.)

After the family court ordered Y.Q.'s removal, ACS called Schneider to arrange for it to discharge Y.Q. to the custody of her godparents. (Id. ¶ 83; Ex. L 202.) Schneider told ACS that Y.Q. would have to return some four days later for surgery, but ACS informed Schneider that Y.Q.'s parents did not want the surgery performed there. (Ex. L 202.) As ACS informed Schneider, Y.Q.'s parents apparently were not happy with the treatment that Y.Q. had received from them and wanted to have her surgery performed at the burn center at Staten Island University Hospital. (Id.)

## III. Discharge

Y.Q. was formally medically cleared and discharged at 6:10 p.m. on January 11, 2006. (Id.) Schneider imposed certain conditions on Y.Q.'s release. Schneider asked ACS to report to

Dr. Jenssen the results of scheduled appointments that Y.Q. had with her pediatrician and a plastic surgeon selected by Y.Q.'s parents. (Ex. L 105.) Schneider also asked that Y.Q. be returned to the hospital if her parents did not follow the treatment plan that ACS had cleared with Schneider. (Id.) Schneider's social work department followed up, after Y.Q.'s discharge, to ensure that the treatment plan was followed. (Ex. F 100107.)

Upon her discharge, Y.Q. stayed with her godparents. (Pl. R. 56.1 ¶ 83.) Denes and Ann Marie had daily contact with their daughter while she was staying with her godparents, but they were never permitted to be alone with Y.Q. Denes's contact was by telephone during the week because of his work schedule. (Id. ¶¶ 84–87.)

On February 9, 2006, the family court ordered, on consent of the parties, Y.Q. returned to her parents' custody. (Id. ¶ 90; Ex. N.) The family court also permitted Y.Q.'s grandmother to visit her, although not without supervision. The babysitter was barred from contacting Y.Q. at all. (Pl. R. 56.1 ¶¶ 90–91.)

On March 27, 2006, ACS withdrew the petition alleging abuse against Y.Q.'s parents. (Id. ¶ 92; Ex. O.) On May 16, 2006, the petitions against Y.Q.'s grandmother and babysitter were withdrawn. (Pl. R. 56.1 ¶ 93; Ex. P.) The nature and cause of Y.Q.'s burn remains unclear to this day. (Pl. R. 56.1 ¶ 95.)

## IV. Litigation

The plaintiffs filed this action in March 2007. In addition to the medical defendants who are still in this action, the plaintiffs sought relief against the City defendants, a group of defendants including several ACS employees who were involved in or supervised Y.Q.'s case, the ACS commissioner, and the City of New York.

9

Against the medical defendants, the plaintiffs asserted constitutional as well as state law claims. The essence of the constitutional claims was that the medical defendants violated Y.Q.'s and her parents' Fourth and Fourteenth Amendment rights when they seized and detained Y.Q. without cause and subjected her to invasive medical procedures (the retinal exam and skeletal survey), also without adequate cause. The state law claims sought to hold the medical defendants liable for that same conduct, as well as for reporting Denes and Ann Marie to ACS and for their role in the subsequent investigation and prosecution of Denes and Ann Marie in family court.

The plaintiffs also asserted both constitutional and state law claims against the City defendants, alleging, in essence, that the City defendants unreasonably relied on Dr. Jenssen in deciding to detain Y.Q. and prosecute her parents. They alleged that Dr. Jenssen has a history of unreasonable and misleading diagnoses of child abuse and that the City defendants should have known about that.

All of the defendants eventually moved to dismiss. The district court mostly denied the motions in September 2008. It granted only the medical and City defendants' motions for judgment on the malicious prosecution claims brought under 42 U.S.C. §1983, as well as the City defendants' motion with respect to a state law abuse of process claim. V.S. v. Muhammad, 581 F. Supp. 2d 365 (E.D.N.Y. 2008) (Irizarry, J.).

The plaintiffs and the City defendants later executed a settlement agreement, which the Court approved in September 2009. Denes Q. v. Caesar, No. 07-CV-1281, 2009 WL 2877155 (E.D.N.Y. Sept. 8, 2009) (Amon, J.).

10

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks omitted).

The movant bears the burden of establishing that no genuine issue of material fact exists. Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The court "must resolve all ambiguities and draw all reasonable inferences against the movant." Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 (2d Cir. 2010). "To survive summary judgment the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal quotation marks and emphasis omitted). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). Moreover, "the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion." Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 84 (2d Cir. 2004).

11

## II. Detention: Constitutional Claims

The plaintiffs claim that the medical defendants unconstitutionally detained Y.Q. "for investigative reasons" as state actors without adequate justification and without providing adequate process. (Pl. Br. at 22–26.)

Resolution of the plaintiffs' claims about detention requires the Court to ask and answer two questions. First, did the medical defendants detain Y.Q. as state actors at any point? Second, did any state-actor detention violate the plaintiffs' federal constitutional rights?

### A. State Action

The federal statute under which the plaintiffs have asserted their constitutional claims, 42 U.S.C. § 1983, "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health, 189 F.3d 273, 280 (2d Cir. 1999) (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997)).

As the Second Circuit has explained, "the core purpose of § 1983 is 'to provide compensatory relief to those deprived of their federal rights by state actors.'" Hardy v. New York City Health & Hosps. Corp., 164 F.3d 789, 795 (2d Cir. 1999) (quoting Felder v. Casey, 487 U.S. 131, 141 (1988)). Consequently, the Court's "first inquiry . . . is whether the actions alleged by the plaintiffs come within the definition of under color of state law." Kia P. v. McIntyre, 235 F.3d 749, 755 (2d Cir. 2000) (internal quotation marks and bracket omitted).

Although the plaintiffs' papers are not entirely clear, at oral argument they clarified that they allege that the medical defendants held Y.Q. as state actors from January 9, 2006 to January 11, 2006. The medical defendants answer that they "never 'detained' or 'removed' Y.Q. from

12

her parents' custody" because "Y.Q. received medical treatment until January 11, 2006—the date she was discharged." (Def. Br. at 30.)

The parties have discussed several cases applying several tests aimed at determining whether private actors can be held liable in several settings under the Constitution as state actors, but the Second Circuit's opinion in Kia P. v. McIntyre provides the rule of decision in this case. In Kia P., the plaintiffs—a mother and her infant child—sought to hold a private hospital liable for detaining the child, Mora, when, shortly after her birth, her urine tested positive for methadone. Id. at 751–52. There, the Second Circuit held that the private hospital detained Mora both as a state actor and also as a private actor. The hospital held her as a private actor when it detained her "between the receipt of the results of the first [urine] test and Mora's ultimate medical clearance eight or nine days later" after a subsequent test revealed that her urine was free of methadone. Id. at 753. This detention was "for medical reasons" because "it was the medical staff that made the initial decision to withhold Mora's release because of the danger of methadone withdrawal" and "from Mora's birth to her medical release, the infant was under medical observation and care by the Hospital's medical staff." Id. at 753, 756.

With respect to detention as a state actor, the Second Circuit explained that, "insofar as the Hospital was acting . . . as part of the reporting and enforcement machinery for CWA [the Child Welfare Administration, an ACS predecessor], a government agency charged with detection and prevention of child abuse and neglect . . . the Hospital was a state actor." Id. at 756.

And in Kia P. the Second Circuit concluded that the private hospital held Mora as part of the reporting and enforcement machinery of the state, since the infant child was detained pursuant to "compliance with Hospital and CWA policies requiring that any child under

13

investigation by CWA not be released from the Hospital without CWA permission." Id. at 752–53, 756–57; see also Estiverne v. Esernio-Jenssen, 581 F. Supp. 2d 335, 343–44 (E.D.N.Y. 2008) (discussing this holding of Kia P.).

Turning to the question of liability for Mora's detention, the Second Circuit concluded that, where the private hospital held Mora as both a private actor and a state actor, the hospital could not be constitutionally liable for Mora's detention. The court explained that where the state and private detentions overlapped, "the Hospital in its role as state actor . . . was incapable of depriving, and therefore did not deprive, mother and daughter of liberties that had already been taken away by the Hospital's medical staff as private, professional persons." Kia P., 235 F.3d at 757. Only when Mora was medically cleared by hospital doctors did Mora's deprivation become the consequence of state action, which exposed the hospital to liability under the Constitution.

Applying the teaching of Kia P. to this case, the Court agrees with the plaintiffs that the medical defendants were state actors capable of violating the plaintiffs' constitutional rights when they detained Y.Q. from January 9, 2006 at about 2:00 p.m. (informal medical discharge) to January 11, 2006 at about 6:00 p.m. (discharge to Y.Q.'s godparents).

Notwithstanding some language in their papers to the contrary, the plaintiffs agreed at oral argument that, from Y.Q.'s arrival at Schneider until her informal discharge, Y.Q. was held "for medical reasons" and was "under medical observation and care" by medical staff. Id. at 753. Y.Q. was not formally medically cleared at any point during that period. During that period, Y.Q. saw several doctors, including a plastic surgeon and a pediatric dermatologist, who all were concerned with the burn on her stomach and provided treatment for that burn. Indeed,

14

Y.Q.'s treatment at the hands of plastic surgeon Dr. Greenberg continued past the date of her informal medical clearance.

Although there is some evidence in the record that Y.Q. could have been discharged before January 9, 2006 (that is, her detention was not absolutely medically necessary), that fact does not mean that Y.Q. was being held at Schneider only for ACS related purposes. See id. at 756 n.2 (fact that "[s]ome evidence suggests that if the Hospital does not have concerns relating to the ability of a parent properly to care for an infant, there may be circumstances when, at least absent further action by the Hospital, that parent may take the child home despite 'medical advice' to the contrary . . . does not establish that absent CWA-related concerns, Mora would have been released to her mother").

The medical defendants' position that a reasonable jury must conclude that Y.Q. was never detained is not persuasive. They do not engage the evidence tending to prove that on January 9, 2006 Y.Q. was set for medical discharge and was not discharged only because ACS told "Nurse Patty" to implement a social hold. Instead, the medical defendants stress the fact that Y.Q. received medical treatment throughout her stay at ACS, up to and including the date of her formal medical discharge.

The medical defendants fail to appreciate that the fact that there is evidence from which a reasonable jury could find that Y.Q. was detained past January 9, 2006 at 2:00 p.m. only because of a social hold is dispositive. That Schneider decided not to abandon medical treatment after that date is of no moment. It simply means that Schneider doctors determined that, while Y.Q. was in "state custody," it was in Y.Q.'s best interests to receive treatment that she either would not otherwise have received or would have received as an out-patient.

15

In sum, a reasonable jury could find that the medical defendants detained Y.Q. as state actors from January 9, 2006 at 2:00 p.m. to January 11, 2006 at about 6:00 p.m. The question then is whether that detention was consistent with the plaintiffs' substantive and procedural constitutional rights.

## B. Substantive Due Process

Although the papers are not entirely clear, the Court considers the plaintiffs to be claiming that the state detention just described violated their substantive due process rights because it was not justified by any constitutionally sufficient state interest.[1]

The medical defendants contend principally that the detention from January 9, 2006 to January 11, 2006, assuming it was state-actor detention, was justified because they were "awaiting further instruction from ACS," which was conducting an investigation into whether a twenty-two month old child who presented with an unexplained injury had been the victim of abuse and required protection from her caregivers. (Def. Br. at 33–34.)

It is well settled that Denes and Ann Marie have a fundamental liberty interest in maintaining custody of their child without state interference. See, e.g., Wilkinson v. Russell, 182 F.3d 89, 103 (2d Cir. 1999) ("It has long been settled in this Circuit that a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection." (internal quotation marks and brackets omitted)); Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996).

Consequently, absent a sufficiently compelling justification, the state may not have separated Denes and Ann Marie from their daughter. See Tenenbaum, 193 F.3d at 600 (citing County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)); Velez v. Reynolds, 325 F. Supp. 2d

---

[1] This is a claim that belongs only to Denes and Ann Marie, not Y.Q., whose challenge to the substance of her detention must be considered under the Fourth Amendment. Southerland v. City of New York, - - - F.3d - - - -, 2011 WL 2279186, at *9 & n.13 (2d Cir. June 10, 2011).

16

293, 303 (S.D.N.Y. 2004) ("Substantive due process protects individuals from arbitrary government intrusions by requiring a reasonable basis or justification for such action.").

Relevant here, the Second Circuit has recognized one such justification to be the "governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Wilkinson, 182 F.3d at 104; see also van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990). Detention to serve that interest is warranted where the state has a "reasonable basis" to believe that a child has been the victim of abuse and that detention is necessary to protect the child from further harm. Wilkinson, 182 F.3d at 104 (internal quotation marks omitted). That standard "reflects the recognized need for unusual deference in the abuse investigation context." Id.

The Second Circuit has also said that detention to serve the interest in protecting children from abuse is warranted where, although "the primary evidence of abuse ha[s] been discredited," the state requires time to process the fact that evidence has been discredited and to determine the most sensible course of action moving forward. Kia P., 235 F.3d at 759.

The Second Circuit has held that brief separations of child and parent "generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." Nicholson v. Scoppetta, 344 F.3d 154, 172 (2d Cir. 2003); see also Southerland, - - - F.3d at - - - -, 2011 WL 2279186, at *17 ("We have also recognized that substantive due process claims in the child-removal context have a temporal dimension."); Tenenbaum, 193 F.3d at 600.

In this case, no reasonable jury could find that the medical defendants' detention of Y.Q. from informal medical clearance to discharge was without adequate justification. The only

17

reasonable view of the evidence is that for the first part of that period, the medical defendants held Y.Q. to permit ACS sufficient time to determine whether and how to proceed against her parents. For part of January 10, 2006, the medical defendants held Y.Q. while the state secured an abuse petition from the family court. And, from January 10, 2006 until discharge, the medical defendants were holding Y.Q. while final arrangements for her discharge were completed. As a matter of law, detention of this sort is clearly not "without a reasonable basis" and also is not "without any reasonable justification in the service of a legitimate governmental objective." Kia P., 235 F.3d at 759.

To the extent that the plaintiffs contend that the medical defendants had an obligation not to accommodate the ACS decision-making process because there was insufficient justification for removal, that argument is rejected. Y.Q. had a burn that those in charge of her care could not explain. The record in this case reveals that ACS viewed that unexplained injury as reason enough to seek removal.

The plaintiffs have not identified any evidence to support the proposition that the medical defendants should have believed that the injury was explained or should have believed that removal for an unexplained injury was inconsistent with state or federal law, such that they should have refused to accommodate a clearly illegal process.

As indicated, courts reviewing the decision of ACS investigators to remove a child for his own protection defer to the reasonable conclusions of those investigators. See Wilkinson, 182 F.3d at 106 ("As we have emphasized, courts must apply the 'reasonable basis' test to permit investigators considerable discretion in the abuse context. This is in keeping with the basic precept that a mere failure to meet local or professional standards, without more, should not generally be elevated to the status of constitutional violation."); Orlik v. Dutchess Cnty., 603 F.

18

Supp. 2d 632, 646–47 (S.D.N.Y. 2009) ("faulty or incorrect report" does not render separation a violation of due process because investigation that is "faulty" or conclusions that are "incorrect or ill-advised" do not violate due process so long as actions are "consistent with some significant portion of the evidence").

The plaintiffs have provided no reason to conclude that the medical defendants must have been more critical of the investigation than a reviewing court. Thus, no reasonable jury could conclude that the medical defendants acted unreasonably in deferring to the ACS process in this case.

## C. Procedural Due Process

The Court also considers the plaintiffs to be arguing that, even if the medical defendants had sufficient justification for detaining Y.Q., the plaintiffs were not provided the procedural protections guaranteed them by the Constitution.[2]

The medical defendants answer that, even if Y.Q. was subjected to state-actor detention on January 9, 2006, the plaintiffs were "provided a hearing at most two days later, on January 11, 2006." (Def. Br. at 31.) They say that that prompt post-removal hearing was sufficient to satisfy the plaintiffs' due process rights.

The plaintiffs' procedural due process claim is "covered by the subset of [Second Circuit] cases addressing circumstances where the government, although not physically taking the child away from the parent, gains custody of the child by refusing to release him or her after the parent has voluntarily granted temporary custody to the government or a third party." Kia P., 235 F.3d

---

[2] This is a claim that belongs to all three of the plaintiffs. Southerland, - - - F.3d at - - - - , 2011 WL 2279186, at *9 ("both the parents and the children may have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process").

at 760; see also Cecere v. City of New York, 967 F.2d 826, 830 (2d Cir. 1992); Duchesne v.
Sugarman, 566 F.2d 817, 822–23 (2d Cir. 1977).

"The rule in this Circuit is that under these circumstances the State has a duty to initiate a
'prompt' post-deprivation hearing after the child has been removed from the custody of his or
her parents." Kia P., 235 F.3d at 760 (citing Gottlieb, 84 F.3d at 520). There is no requirement
for a pre-deprivation hearing, which is usually required in non-emergency circumstances, as "the
Hospital already had custody of [Y.Q.] at the moment she was medically cleared." Id. at 760
n.4. As a matter of law, Denes and Ann Marie received a prompt post-deprivation hearing in this
case. Here, viewing the evidence in the light most favorable to the plaintiffs, the actual removal
was effected on January 9, 2006 at about 2:00 p.m. and the formal order of removal (secured
January 10, 2006) was presented to a state family court on January 11, 2006, two days after the
medical defendants took custody of the child as state actors.

The plaintiffs have not explained why, in view of these facts, they were not provided a
sufficiently prompt opportunity to contest the removal of Y.Q. See id. at 761; Cecere, 967 F.2d
at 830 (permitting four day deprivation in the face of evidence of abuse); Taylor v. Evans, 72 F.
Supp. 2d 298, 307–08 (S.D.N.Y. 1999) (four-day period was "short-lived and relatively non-
disruptive" and consistent with due process); Dietz v. Damas, 932 F. Supp. 431 (E.D.N.Y. 1996)
(twelve day delay reasonable).

## D. Fourth Amendment

The Court also understands the plaintiffs to be arguing that the same state detention that
violated the Due Process Clause also violated Y.Q.'s rights under the Fourth Amendment. The
medical defendants' answer to this claim is similar to their answer to the due process arguments:
any detention "was reasonable" because there is no evidence that "the medical defendants had

20

the authority or any reason to challenge ACS's decision" to impose a social hold. (Def. Br. at 39.)

The Second Circuit has not clearly explained "which of three modes of determining whether a seizure was 'reasonable' under the Fourth Amendment should apply in cases where the state seizes a child in order to prevent abuse or neglect." Kia P., 235 F.3d at 762. That is, it is not clear whether the state requires probable cause, or whether "special needs" justify application of a "less stringent reasonableness requirement," or whether detention can only be justified by "exigent circumstances." Id. (discussing Tenenbaum, 193 F.3d at 603–05).

In any event, like the Second Circuit in Kia P., the Court need not resolve this issue. This is because, under any standard, the medical defendants' detention of Y.Q. in this case did not violate the Fourth Amendment "for substantially the same reasons that militate against [the] finding of a due process violation." Id. at 762–63.

## III. Testing: Constitutional Claim

The Court now turns to the plaintiffs' claim that the medical defendants violated Y.Q.'s Fourth Amendment rights when they subjected her to medical testing. The plaintiffs claim that Dr. Jenssen, as a state actor, "ordered both a skeletal survey and an ophthalmology exam, both of which were medically unnecessary to treat Y.Q's burn," for the purpose of investigating child abuse. (Pl. Br. at 25–26.) They contend that the medical defendants needed a court order or consent to perform those tests, but they lacked both; the consent allegedly secured was secured through deception. (Id. at 26.)

The medical defendants answer that the tests were not ordered by ACS and were performed "for medical and not investigative purposes." (Def. Br. at 36–37.) They say also that

21

even if the tests are regulated by the Fourth Amendment—because state action and for
investigative purposes—the tests were reasonable. (Id. at 37.)

In arguing for liability, the plaintiffs rely on the Second Circuit's holding that "the
Constitution assures parents that, in the absence of parental consent, x-rays of their child may not
be taken for investigative purposes at the behest of state officials unless a judicial officer has
determined . . . that grounds for such an examination exist." van Emrik, 911 F.2d at 867.

In van Emrik, the plaintiffs sued government investigators who, against the advice of a
doctor, ordered the doctor to perform potentially harmful x-rays to identify "previous fractures
elsewhere in the child's body that had gone undetected and had since healed." Id. In that case,
the Second Circuit ruled that the government defendants could be liable.

The plaintiffs also rely on the Second Circuit's application of the van Emrik holding to
rule that the Fourth Amendment regulates a government investigator who brought a young girl
who was the suspected victim of sexual abuse to a hospital and asked a doctor to perform a
physical examination the girl, which examination aimed to discover signs of sexual abuse.
Tenenbaum, 193 F.3d at 597–99. In Tenenbaum, the court rejected the argument that the
government need not secure consent or a court order where the test, which was ordered by an
investigator "for the purpose of determining whether [sexual] abuse had occurred," might have
uncovered injuries in need of treatment; that fact did not render the test "medically indicated and
designed for treatment." Id. at 599. In reaching that result, the Second Circuit compared the
facts of the case with the facts of two district court cases in which government defendants were
held not liable for tests performed on children who were the suspected victims of abuse and who
were brought, by government investigators, to hospitals for examination.

22

In one of those cases, Chayo v. Kaladjian, x-rays were ordered on a child with a visible bruise on his head to facilitate a diagnosis of the nature of the injury and to "determine what treatment, if any, was necessary." 844 F. Supp. 163, 169 (S.D.N.Y. 1994). The district court concluded that the rule of van Emrik did not apply because (a) "the x-ray examinations were ordered not by the caseworkers but by Dr. Ibrahm Ahmed, a pediatric resident at St. Vincent's Hospital" and (b) the x-rays were ordered "for medical rather than investigative purposes." Id.

The plaintiffs in that case argued for liability on the ground that the "medical records state that the purpose of the medical examinations, including the x-rays, was to make sure the children are not being abused." Id. at 170 n.2 (internal quotation marks and emphasis deleted). The court rejected that argument because the cited records did not bear directly on Dr. Ahmed's reasons for ordering the tests and because, "[m]ore importantly, it does not in any way suggest that the caseworkers requested the x-rays." Id.

The second case discussed by the Second Circuit was Schwimmer v. Kaladjian, in which the plaintiffs sought to hold liable two government agencies and agency employees for the fact that a doctor at Beth Israel ordered, without judicial process, "two sets of x-rays . . . , both skull and skeletal series," on a child who was brought to the hospital by two police officers and who was covered with ecchymotic lesions. 988 F. Supp. 631, 637 (S.D.N.Y. 1997).

In Schwimmer, the district court ruled that the "analogy . . . to the child in van Emrik is inappropriate" because "the record is devoid of evidence that [ACS employees] directed Beth Israel to take skeletal x-rays of [the child] for investigatory purposes and that the x-rays were 'not medically necessary or advisable.'" Id. at 641. Although the case does not discuss the fact, there does not appear to have been any suggestion that the tests in Schwimmer would identify an injury in need of treatment.

23

The plaintiffs in this case focus on whether the tests at issue were investigative. The plaintiffs' claim in this case fails because no reasonable jury could find for them on an issue that is antecedent to that question; namely, whether ordering the tests was state action. No reasonable jury could find that the medical defendants performed the challenged tests in this case as state actors. The Kia P. state action test, which the Court detailed earlier, compels this result.

The record is clear that ACS did not order the tests at issue. It is undisputed that Y.Q. arrived voluntarily at Forest Hills and Schneider and, as the plaintiffs state in their papers, Dr. Jenssen "made the decision to conduct a skeletal survey and an ophthalmologic exam, . . . neither of which had been requested by ACS." (Pl. Br. at 14.) There is no evidence that the medical defendants ordered the tests because the state—or Schneider, implementing a state policy—required that private physicians perform medical tests to confirm a suspicion of child abuse. The Schneider policy concerning children who are the suspected victims of abuse, which the parties have provided the Court, makes no mention of testing. (Ex. 9.)

More important, the record reveals a medical, non-ACS purpose for the challenged tests. The plaintiffs' expert, Dr. Kai Sturmann, testified that the skeletal survey and eye exam were not undertaken to facilitate treatment because retinal bleeds cannot be treated and because a doctor looking for fractures in need of treatment would not perform a skeletal survey, which would reveal only old, healed breaks. (Ex. R.) But Dr. Sturmann also testified that the tests had a "medical purpose" and were properly ordered as part of a medical diagnostic work up of a child with an unexplained injury. (Id.) Thus there is unchallenged evidence that a private medical professional, exercising medical judgment, would—as the medical defendants say they did here—order these exams as part of a diagnostic workup without regard to ACS. This evidence

24

reflects the fact that the professional concerns of physicians like those involved in this case are not as narrow as the plaintiffs appear to believe (i.e. "treatment" and only "treatment").

The fact that private doctors, when ordering tests like those at issue here, know that ACS will be interested in, and may act upon, the results (insofar as they confirm or rule out child abuse) does not mean that the Constitution regulates those private doctors' decisions. Cf. Blum v. Yaretsky, 457 U.S. 991, 1008–09 (1982) (state not responsible for medical decisions to discharge residents from private nursing facilities even though private party knows that state will review discharge decision and adjust benefits in response to discharge) (cited as relevant to liability determination in Kia P.).

Finally, the Court observes that the plaintiffs have not provided the Court a single case in which a private doctor—or, derivatively, a hospital—not acting at the clear direction of the state, has been subject to Fourth Amendment scrutiny for the decision to order tests designed to confirm a suspicion that an unexplained injury on a child whose parents voluntarily brought him to the hospital was the result of abuse. Absent such authority, the Court is not inclined to subject private doctors or hospitals to Fourth Amendment regulation in the circumstances present here.

## IV. Constitutional Right to Adequate Medical Care

In their opposition papers, the plaintiffs assert for the first time a claim about Y.Q.'s constitutional right to adequate medical care. They argue that Y.Q.'s January 9, 2006 removal from the custody of her parents "changed the legal relationship between Y.Q. and Hospital defendants." (Pl. Br. at 26.) They say that from that date, "as an individual in government custody, Y.Q. had a right to adequate medical treatment." (Id.) And they argue without any real explanation that the medical defendants violated that right.

25

To support liability, the plaintiffs allege that the medical defendants "actions fell far below accepted medical care," thus exposing them to constitutional liability, because they (1) failed to discuss with ACS the rationale for removing Y.Q. from her family; (2) failed to discuss with ACS the basis of its decision to remove; (3) failed to tell ACS that they did not recommend removal, if they did not; (4) failed to ask about the justification for ACS's decision to remove Y.Q.; (5) failed to advocate for Y.Q.'s best interests; and (6) failed to go up the chain of command to advocate for Y.Q.

For this, the plaintiffs rely on the testimony of their expert, Dr. Sturmann. The deposition excerpts are not complete, but Dr. Sturmann apparently was explaining what he believed some unnamed Schneider doctors should have done to prevent a harmful removal if they believed "that the parents were not involved in causing the burn." (Ex. 3 at 89.) It is not clear on what evidence Dr. Sturmann was relying for the proposition that some unnamed Schneider doctors were of the belief that Denes and Ann Marie were not "involved in causing the burn," or if he was simply answering a hypothetical question.

The medical defendants answer this argument by urging that the plaintiffs' position is inconsistent with Kia P., which "found no basis for Section 1983 liability against the hospital to the extent the hospital acted as both a provider of medical care and in a social welfare role during the period of time in which the hospital retained the infant for medical treatment and to protect her from suspected abuse." (Def. Reply at 18–19.) They also argue that Y.Q. received adequate medical care. (Id. at 19.)

This claim cannot survive summary judgment. First, the plaintiffs have not cited any authority for the proposition that the medical defendants—private entities and a private individual—had any constitutional obligation to provide medical care to Y.Q. simply because,

during the period in question, they were detaining her solely as state actors under the test outlined in Kia P.

And, as the defendants observe, the idea that the medical defendants had such a legal obligation (however defined) is in some tension with—although not clearly foreclosed by—the Second Circuit's holding in Kia P. that, even though the private hospital was holding Mora as a state actor, it could not be liable for the manner in which it provided medical care. 235 F.3d at 756 ("[I]nsofar as the Hospital and its employees rendered medical care to Kia P. and her newborn daughter, the Hospital was . . . not a state actor. Whatever misdeeds the Hospital defendants may have committed in providing that care—if any there were—they are not redressable under § 1983." (citation omitted)).

Second, the plaintiffs have not clearly identified or justified the content of any constitutional obligation to provide a certain level of medical care. For example, in support of their claim that Y.Q. had a right to "adequate medical treatment," the plaintiffs cite Estelle v. Gamble, which holds that, under the Eighth Amendment, an incarcerated individual has a right to adequate medical care that is infringed by "deliberate indifference to [his] serious medical needs." 429 U.S. 97, 104 (1976); see also Johnson v. Wright, 412 F.3d 398 (2d Cir. 2005); Chance v. Armstrong, 143 F.3d 698 (2d Cir. 1998). The citation to this case is unexplained and confusing: Y.Q. was not incarcerated and the plaintiffs do not appear to urge deliberate indifference as the rule that governs here.

The plaintiffs then change tack and say that hospitals and doctors "will be liable for violating the substantive due process right of their patients to adequate medical treatment if their conduct is 'such a substantial departure from accepted professional judgment, practice or

27

standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" (Pl. Br. at 26–27 (quoting Youngberg v. Romeo, 457 U.S. 307, 323 (1982).)

Youngberg involved civilly committed mentally ill individuals confined for their own good and held that those individuals have "liberty interests in safety and freedom from bodily restraint" that require states to "provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 319. That right is infringed when a professional's determination regarding what training is required "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323.

The relevance of this case is not apparent: Y.Q. is not mentally ill, was not civilly committed, and the plaintiffs do not argue that she had a right to "minimally adequate or reasonable training to ensure safety and freedom from undue restraint."

Third, assuming one of these constitutional obligations is applicable, the plaintiffs have not explained how the medical defendants were either "deliberately indifferent" to Y.Q.'s medical need to avoid removal or how they based the decision not to actively oppose removal on something other than "professional judgment." Absent some better guidance from the plaintiffs, the Court does not understand how a reasonable jury, viewing the evidence in the light most favorable to the plaintiffs, could conclude that the medical defendants were indifferent or exercised something other than professional judgment.

In any event, this entire theory of liability lacks merit. There is no evidence that the medical defendants believed that removal was inappropriate or harmful to Y.Q. And the Court has already explained that no reasonable jury could find that the medical defendants violated the Fourth Amendment or the Due Process Clause in connection with Y.Q.'s detention. For similar

28

reasons, no reasonable jury could find that they violated some undefined constitutional right to adequate medical care for failing to stop or oppose the removal that the detention facilitated.

## V. State Law Claims

The Court now turns to the plaintiffs' remaining state law claims, which are claims against the medical defendants alleging malicious prosecution, unlawful imprisonment, gross negligence, and professional negligence.

As an exercise of discretion, the Court may refuse to exercise jurisdiction over these claims. See Matican v. City of New York, 524 F.3d 151, 154–55 (2d Cir. 2008) ("if Matican has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over pendent state-law claims").

Considerations of "'judicial economy, convenience, fairness, and comity'" do not warrant adjudication of these claims in federal court. Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). The Court appreciates that the plaintiffs have committed substantial resources to litigating this case in federal court, but, relevant here, almost none of those resources were devoted to developing facts unique to the state law claims; those facts are relevant in the main to the federal claims, too.

Moreover, none of the state law claims is of special federal concern and the gross negligence claim, which appears in large part to respect actions taken pursuant to New York's mandatory reporting law, as well as the medical negligence claim, present issues of special concern to New York. Consequently, the state law claims belong in New York's courts.

29

## **CONCLUSION**

The defendants' motion for summary is granted with respect to the constitutional claims.

The Court declines to exercise jurisdiction over the state law claims.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       September 2/, 2011

s/CBA

Carol Bagley Amon
Chief United States District Judge

30